2001-NMSC-033

34 P.3d 1134

**STATE of New Mexico, Plaintiff–Respondent,**

v.

**Lathan BENALLY, Defendant–Petitioner.**

**No. 26,245.**

Supreme Court of New Mexico.

Oct. 17, 2001.

Phyllis H. Subin, Chief Public Defender, Susan Roth, Assistant Appellant Defender, Santa Fe, NM, for Petitioner.

Patricia A. Madrid, Attorney General, William McEuen, Assistant Attorney General, Santa Fe, NM, for Respondent.

## OPINION

FRANCHINI, Justice.

{1} Defendant was convicted of second-degree murder and tampering with evidence for his involvement in the death of Marco LaPlant following a fight at an outdoor party near Farmington, New Mexico. On appeal, Defendant argues that his conviction must be reversed because errors in the jury instructions prevented the jury from appreciating that the State had the burden of disproving self-defense. The Court of Appeals determined that a third, correct jury instruction cured the error in two instructions that had failed to explain the State's burden. We reverse the Court of Appeals and hold that, because of its distance from the erroneous elements instruction and the unlikelihood

that the jury would, sua sponte, graft language from a proper instruction onto improper instructions, the single proper instruction did not correct the improper self-defense instruction. The erroneous instruction therefore constituted fundamental error. We reverse Defendant's second-degree murder conviction and remand for a new trial.

## I.

{2} At a late night outdoor party at "the levels," near Farmington, New Mexico, a fight broke out between Defendant and Orlando Delagrito. A friend of Defendant, Christopher Johnson, intervened and chased Mr. Delagrito to a green Chevrolet Nova. When Mr. Delagrito entered the Nova, Christopher Johnson and a third friend threw rocks at the car and challenged Mr. Delagrito to fight. The Nova drove off, but not before a rock shattered a rear window of the vehicle.

{3} The Nova belonged to the victim, Marco LaPlant, a friend of Mr. Delagrito. Mr. LaPlant had witnessed the vandalism of his vehicle and followed the Nova on foot as Mr. Delagrito drove it to safety. After approximately fifteen minutes, an angered Mr. LaPlant drove his Nova back to the levels, where Mr. Johnson had rejoined Defendant and some fourteen other people. The Nova kicked up a cloud of dust as Mr. LaPlant slammed on the brakes next to a truck where the group was gathered. Mr. LaPlant emerged from the vehicle brandishing a car jack that most witnesses believed was a gun. Someone yelled "gun" while everyone scrambled to hide. As Mr. LaPlant approached, Defendant, who had been hiding behind the truck, struck Mr. LaPlant on either the head or shoulder with an empty bottle of whiskey. Defendant and Mr. LaPlant then continued fighting.

{4} The parties dispute the events that followed. According to Mr. Johnson, a witness for the prosecution, when Mr. LaPlant gained position on top of Defendant, Mr. Johnson picked up a large, heavy rock and used it to strike Mr. LaPlant on the back. Mr. Johnson testified that he then helped Defendant to his feet and temporarily left the scene of the fight to go vandalize Mr. LaPlant's Nova. As he left, numerous people, including Defendant, were kicking and punching Mr. LaPlant. When he returned, Mr. Johnson found Mr. LaPlant covered in blood and breathing irregularly. Mr. Johnson testified that he and Defendant then got in a car, but before they could leave, Defendant exited the car and approached Mr. LaPlant. According to Mr. Johnson, Defendant kicked Mr. LaPlant in the side and then dropped a large rock onto the victim. Mr. Johnson did not see where the rock landed.

{5} The State also produced evidence regarding statements allegedly uttered by Defendant during the fray. Eyewitness Danielle Enos and her sister Dacia both testified that they heard Defendant tell Mr. LaPlant "croak, motherfucker, croak." Titus Jacquez testified that Defendant declared that he would have to kill Mr. LaPlant so he would not have to "worry," and then said "later" as he kicked Mr. LaPlant in the face. Mr. Johnson did not remember or could not hear what, if anything, Defendant said to Mr. LaPlant.

{6} Although many witnesses saw Mr. Johnson strike Mr. LaPlant with a rock, only Mr. Johnson, a co-defendant in the case, offered testimony that Defendant struck the victim with a rock. Defendant attacked Mr. Johnson's testimony by raising inconsistencies between his testimony and pre-trial statements. Defendant also attempted to discredit Mr. Johnson's testimony by suggesting that Mr. Johnson, who had pleaded guilty to first degree murder, received a lighter sentence (ten years maximum) and a postponement of that sentence in exchange for his testimony.

{7} According to Defendant, after Mr. LaPlant's Nova came speeding toward the group with whom he had gathered, he heard people yell "gun." Defendant admitted that he hit Mr. LaPlant with a whiskey bottle but claimed that he made contact with his shoulder rather than his head. He said that while Mr. LaPlant had him pinned to the ground he heard someone say "get back," then heard three cracks above him before someone removed Mr. LaPlant from on top of him. Defendant got up and started kicking Mr. LaPlant but could not recall if some of the blows landed on Mr. LaPlant's head. According to Defendant, he entered a friend's car, but exited the vehicle in order to smash the Nova's headlights and windshield. He

then returned to the car and left the levels. Defendant testified that he never revisited Mr. LaPlant's body after the initial fight, that he never hit Mr. LaPlant with a rock, and that he neither voiced nor entertained a desire to kill Mr. LaPlant.

{8} According to Dr. Patricia McFeeley, the State's pathologist/medical examiner, the victim died as a result of brain swelling caused by a combination of blows to the head. Dr. McFeeley testified that the fatal head injuries could have been dealt by a bottle, a rock, or a kick to the head regardless of the kind of footwear worn by the person kicking. Dr. Karen Griest, a forensic pathologist hired by Defendant, identified the cause of death as trauma from a "rigid, heavy object." Dr. Griest testified that it was unlikely that a kick leveled by someone wearing tennis shoes of the sort worn by Defendant on the night in question could have caused Mr. LaPlant's death. Dr. Griest also observed that there were no glass fragments in the victim's scalp or clothes.

{9} The jury acquitted Defendant of first-degree murder and convicted him of second-degree murder and tampering with evidence. Defendant received a sentence of fifteen years for the murder and eighteen months for tampering with evidence. On appeal, among other issues, Defendant asserted that the trial court committed fundamental error by giving jury instructions that did not adequately treat his self-defense claim. *State v. Benally*, No 19,897, at p. 1 (NMCA Feb. 21, 2000). A divided Court of Appeals held that the errors in the jury instructions did not amount to fundamental error and affirmed

Defendant's conviction. *Id.* at pp. 3–10. In a dissenting opinion, Judge Bustamante argued that the erroneous jury instructions did amount to fundamental error. *Id.* at pp. 8–9. We granted certiorari to review the instructions.

## II.

{10} The trial court determined that self-defense was at issue in this case and gave the jury a series of self-defense instructions. Defendant alleges that three errors resulting from those instructions require the reversal of his conviction. First, instruction 12, the elements instruction for second-degree murder, failed to include the element of unlawfulness.[1] Unlawfulness is an essential element of the offense in cases, like the present one, in which self-defense or defense of another is at issue. *State v. Parish*, 118 N.M. 39, 43, 878 P.2d 988, 992 (1994) ("[W]hen self-defense or the defense of others is at issue, the absence of such justification is an element of the offense.") (internal citations omitted). In order to prove unlawfulness, the State must disprove the defendant's self-defense claim beyond a reasonable doubt. *See id.* According to Defendant, the failure to include unlawfulness among the elements of second-degree murder prevented the jury from understanding the State's burden.

{11} In addition to the omission of unlawfulness from instruction 12, Defendant complains that instruction 15, which followed the instructions for homicide offenses, described self-defense in non-deadly force cases rather than in homicide cases.[2] Finally, Defendant

---

1. Instruction 12 read as follows:

   For you to find the defendant guilty of second degree murder, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime:
   1. The defendant killed Marco LaPlant[ ];
   2. The defendant knew that his acts created a strong probability of death or great bodily harm to Marco LaPlant;
   3. The defendant did not act as a result of sufficient provocation;
   4. This happened in New Mexico on or about the 7th day of July, 1997.
   Instructions 10 and 18, listing the elements for first degree murder and voluntary manslaughter, respectively, also erroneously omitted the element of unlawfulness. However, because Defendant was not convicted of either first degree

murder or voluntary manslaughter, we do not address these errors.

2. Instruction 15 informed the jury that:

   Evidence has been presented that the Defendant acted while defending himself.
       The Defendant acted in self-defense if:
   1. There was an appearance of immediate danger of death or great bodily harm to the Defendant as a result of being attacked with a deadly weapon by Marco LaPlant[ ]; and
   2. The Defendant was in fact put in fear, by the apparent danger of immediate death or great bodily harm and struck Marco LaPlant[ ] because of that fear; and
   3. The apparent danger would have caused a reasonable person in the same circumstances to act as the Defendant did.

observes that instruction 15 failed to explain that the State shouldered the burden of proving that Defendant did not act in self-defense. Because we determine that the omission of unlawfulness from instruction 12 constituted fundamental error, we do not review these claims independently.

{12} The standard of review we apply to jury instructions depends on whether the issue has been preserved. If the error has been preserved we review the instructions for reversible error. *See Parish* at 42, 878 P.2d at 991. If not, we review for fundamental error. *State v. Cunningham,* 2000–NMSC–009, ¶ 8, 128 N.M. 711, 998 P.2d 176. Under both standards we seek to determine " 'whether a reasonable juror would have been confused or misdirected' by the jury instruction." *Cunningham,* 2000–NMSC–009, ¶ 14, 128 N.M. 711, 998 P.2d 176 (quoting *Parish,* 118 N.M. at 42, 878 P.2d at 991). A juror may suffer from confusion or misdirection despite the fact that the juror considers the instruction straightforward and "perfectly comprehensible" on its face. *Parish,* 118 N.M. at 44, 878 P.2d at 993. Thus, juror confusion or misdirection may stem not only from instructions that are facially contradictory or ambiguous, but from instructions which, through omission or misstatement, fail to provide the juror with an accurate rendition of the relevant law.

{13} In *Parish,* a defendant standing trial for voluntary manslaughter presented evidence that raised a reasonable possibility that he acted in self-defense. *Parish,* 118 N.M. at 42, 878 P.2d at 991. Parish tendered an instruction that listed the absence of self-defense as an element of voluntary manslaughter, but the trial court rejected that instruction. *Id.* at 44, 878 P.2d at 993. Although not required by the Uniform Jury Instructions at the time, we held that reversible error nevertheless resulted from the trial court's failure to include the element of unlawfulness among the other elements of voluntary manslaughter. *Id.* at 43–44, 878 P.2d at 992–93. The erroneous voluntary manslaughter instruction could not be corrected by other instructions. *Id.* at 44, 878 P.2d at 993.

{14} In *State v. Armijo,* 1999–NMCA–087, ¶¶ 11–27, 127 N.M. 594, 985 P.2d 764, the Court of Appeals evaluated a set of jury instructions that were slightly different from those in *Parish.* As in *Parish,* the trial court had instructed the jury on self-defense but failed to include unlawfulness as an element in the instructions for the relevant offense. *Armijo,* 1999–NMCA–087, ¶ 11, 127 N.M. 594, 985 P.2d 764. The *Armijo* Court distinguished its case from *Parish,* however, because in *Parish,* apart from the error in the elements section, the general self-defense instruction had also failed to properly state the State's burden of disproving self-defense. *Armijo,* 1999–NMCA–087, ¶¶ 15–17, 127 N.M. 594, 985 P.2d 764 (citing *Parish* at 44, 878 P.2d at 993). In *Armijo,* on the other hand, the general self-defense instruction did state the proper burden of proof. *Id.* The *Armijo* Court held that in determining the sufficiency of jury instructions, "it is sufficient if [the State's burden to disprove self-defense] is in the defense instruction, even if not in the elements instruction, provided that no other instruction causes the defense instruction to be confusing or meaningless." *Id.* at ¶ 26. Because the self-defense instruction given to jury in *Armijo* accurately described this burden, the Court affirmed the defendant's aggravated battery conviction. *Id.* at ¶ 28.

{15} In *Cunningham,* we elaborated on the capacity of other instructions to cure an elements instruction that improperly omits unlawfulness. *Cunningham* involved a first-degree murder conviction based on an elements instruction that, like the instructions at issue in *Parish* and *Armijo,* failed to include unlawfulness. *Cunningham,* 2000–NMSC–009, ¶ 8, 128 N.M. 711, 998 P.2d 176. Unlike the defendant in *Parish,* Cunningham failed to object to the erroneous instruction. *Cunningham,* 2000–NMSC–009, ¶ 8, 128 N.M. 711, 998 P.2d 176. We therefore reviewed his claim for fundamental error, not reversible error. *Id.* Under the fundamental error analysis in *Cunningham,* we sought to determine whether the erroneous jury instruction was "corrected by subsequent prop-

In considering this defense, and after considering all the evidence in the case, if you have a reasonable doubt as to the Defendant's guilt, you must find him not guilty.

er instructions that adequately address[ ] the omitted element." *Id.* at ¶ 21. After examining the record as a whole, we affirmed Cunningham's conviction because a separate instruction correctly stated the element at issue, thereby erasing the possibility of juror confusion on the matter. *Id.* at ¶ 14.

{16} In New Mexico, then, unpreserved error in jury instructions is "fundamental" when it remains uncorrected, thereby allowing juror confusion to persist. Because both parties in the present case agree that instruction 12 was erroneous, and that Defendant failed to object to that error, we now employ *Cunningham* and review the case for fundamental error. Examining the whole record, we seek to determine whether the erroneous omission of the burden of proof from instruction 12 was corrected so as to eliminate juror confusion.

## III.

{17} The incomplete elements instruction in the present case was followed by two self-defense instructions: instruction 15, which also omitted the State's burden, and instruction 25, which included the correct burden.[3] The State argues that, notwithstanding instruction 15, instruction 25 corrected all possible confusion stemming from instruction 12. We agree with the State, and with the Court of Appeals, that instruction 25 was proper: it represented a precise adaptation of UJI 15-5183, and, most importantly, explained to the jury that "[t]he burden is on the state to prove beyond a reasonable doubt that the defendant did not act in self defense." *Benally*, 19,897, at p. 3. It is therefore clear that the jury understood the State's burden with regard to the set of offenses to which instruction 25 pertained. We now address whether instruction 25 was capable of rescuing the jury from the confu-

sion that stemmed from the omission in instruction 12.

{18} We begin our evaluation of the corrective capacity of instruction 25 with the common sense proposition that the jury understands the inclusion and omission of language in a jury instruction to reflect the intent of its author. Just as a jury expects an element included in an instruction to reflect the intent to include that element within the relevant law, the jury would naturally assume that the omission of an element reflects the intent to exclude that element from the law governing the issue. When posed with instruction 25 that included the State's burden of proof, and instructions 12 and 15, which omitted the burden, we believe that a juror would be inclined to believe that the author of instructions 12 and 15 intended the omission, and that the State's burden of proof was therefore not part of those instructions. Thus, in order to correct the error in instruction 12, instruction 25 must have convinced the jury that its correct statement of the burden of proof applied not only to the offenses it addressed, but also to the offense of second-degree murder, which instruction 12 addressed.

{19} Nothing on the face of the instructions, nor in their placement, suggested to the jury that the burden of proof from instruction 25 applied to second-degree murder. Instruction 25 addressed aggravated battery and voluntary manslaughter rather than second-degree murder, and a span of thirteen instructions separated it from instruction 12. The comparative nearness of erroneous instruction 15 to instruction 12 suggests that the jury would apply it, before the more remote instruction 25, to second-degree murder.

{20} The inapplicability of instruction 25 to second-degree murder would probably have

---

**3.** Instruction 25 provided:
Evidence has been presented that the defendant acted in self-defense. The defendant acted in self-defense if:
1. There was an appearance of immediate danger of death or great bodily harm to the defendant as a result of being attacked by Marco LaPlant[ ] with a deadly weapon;
2. The defendant was in fact put in fear of immediate death or great bodily harm and struck Marco LaPlant[ ];

3. The apparent danger would have caused a reasonable person in the same circumstances to act as the defendant did.
*The burden is on the state to prove beyond a reasonable doubt that the defendant did not act in self-defense. If you have a reasonable doubt as to whether the defendant acted in self-defense, you must find the defendant no[t] guilty.* (Emphasis added).

been reinforced in the minds of the jury by other instructions. Instruction 9, which admonished the jury that "[e]ach crime charged should be considered separately," would have buttressed their logical inclination to consider the instructions accompanying the manslaughter and battery offenses separately from the instructions accompanying second-degree murder. UJI 14–6004 NMRA 2001. Instruction 1, which ordered the jury not to "pick out one instruction or parts of an instruction and disregard others," would have prevented the jury from interposing language from instruction 25 onto instructions 12 and 15. UJI 14–6001 NMRA 2001. We believe it is likely that at least some jurors would have perceived the two inconsistent instructions in a manner consistent with that theorized by Judge Bustamante in his dissent:

> I believe I would be very confused by the two self defense instructions, and that, in an effort to make sense of them, I would apply the erroneous self defense instruction to the first degree and second degree murder charges which it follows, and would apply the correct jury instruction to the voluntary manslaughter and aggravated battery instruction which it follows.

*Benally,* 19,897 at p. 10. Because we do not believe that a reasonable juror, following the given instructions, would graft the correct burden of proof from instruction 25 to the offense of second-degree murder, we hold that instruction 25 could not have corrected the omitted element from instruction 12.

## IV.

{21} The State also argues that the prosecutor's remarks during her closing statement, in which she read instruction 25 and reminded the jury of the State's burden of proof, supports the conclusion that a reasonable juror would not have been confused or misled as to the appropriate burden of proof. We do not agree that attorney commentary is capable of correcting an erroneous jury instruction. We presume that the jury followed the instructions given by the trial court, not the arguments presented by counsel. *State v. Baca,* 1997–NMSC–045, ¶ 45, 124 N.M. 55, 946 P.2d 1066 ("[W]e are not willing to assume that the jury took the comment during closing and applied it as the law governing the case, ignoring the instructions given by the court."); *State v. Armendarez,* 113 N.M. 335, 338, 825 P.2d 1245, 1248 (1992) ("We presume that the jury followed the written instructions and did not rely for its verdict on one very brief part of the State's closing remarks."). For these reasons, the prosecutor's closing argument was incapable of correcting the fundamental error that resulted from the defective jury instructions. Neither have we found any other indication, either within the instructions or the record as a whole, that the jury overcame the error in instruction 12 and reached an accurate understanding of the State's burden of proof.

## V.

{22} The juror confusion and misdirection resulting from instruction 12 remained uncorrected and resulted in fundamental error under the *Cunningham* standard. *Cunningham,* 2000–NMSC–009, ¶ 20, 128 N.M. 711, 998 P.2d 176. We therefore reverse Defendant's conviction and remand for a new trial.

{23} **IT IS SO ORDERED.**

PAMELA B. MINZNER and PETRA JIMENEZ MAES, JJ., concur.

JOSEPH F. BACA, J., and PATRICIO M. SERNA, C.J., dissented.

BACA, Justice, dissenting.

{24} I respectfully dissent. I find no fundamental error in this case and would affirm the Defendant's convictions for second degree murder and tampering with evidence. My disagreement with the Court's holding is predicated on the majority's finding of fundamental error based entirely upon a focused analysis of the jury instructions. The doctrine of fundamental error "is bottomed upon the innocence of the accused or a corruption of actual justice." *State v. Sanchez,* 58 N.M. 77, 84, 265 P.2d 684, 688 (1954). Hence, this Court's obligation does not rest on resolving the narrow issue of whether there exists error in the jury instructions. Rather, the court must focus on the broader issue of whether the Defendant's conviction for second degree murder " 'is so doubtful that it would shock the judicial conscience to allow

the conviction to stand.'" *Cunningham*, 2000–NMSC–009, ¶ 13, 128 N.M. 711, 998 P.2d 176 (quoting *State v. Baca*, 1997–NMSC–045, ¶ 41, 124 N.M. 55, 946 P.2d 1066). To properly resolve this issue, the Court is obliged to review the entire record, placing the jury instructions in the context of the individual facts and circumstances of the case, to determine whether the Defendant's conviction was the result of a plain miscarriage of justice. *See State v. Osborne*, 111 N.M. 654, 662, 808 P.2d 624, 632 (1991) (reaffirming that the doctrine of fundamental error applies only under exceptional circumstances in order to prevent a miscarriage of justice). Upon a complete and thorough review of the record before us, it is clear that the evidence presented to the jury in this case leaves little dispute that the Defendant killed the victim without any legal justification. Therefore, any deficiency that can be found in the self-defense instructions, when analyzed in the context of the facts of this case, does not constitute fundamental error. Accordingly, the Defendant's convictions should be affirmed.

## I.

{25} There exist two distinct but interrelated aspects to a true fundamental error analysis. The first aspect, which could be characterized as the procedural prong of fundamental error, provides an exception to the preservation requirement. *See* Rule 12–216(B)(2) NMRA 2001 ("This [preservation] rule shall not preclude the appellate court from considering ... questions involving: ... fundamental error or fundamental rights of a party."). The second, or substantive aspect of fundamental error, provides the standard of review under which the issues claimed by the defendant are analyzed on appeal. In essence, it is the lens through which the Court reviews unpreserved error. *See, e.g., Cunningham*, 2000–NMSC–009, ¶ 21, 128 N.M. 711, 998 P.2d 176 ("Parties alleging fundamental error must demonstrate the existence of circumstances that 'shock the conscience' or implicate a fundamental unfairness within the system that would undermine judicial integrity if left unchecked."). To provide a foundation, I will discuss these two aspects of fundamental error analysis in

turn so that I may better illuminate my disagreement with the majority's opinion.

## A.

{26} The threshold question in any case on appeal is whether the claimed errors were properly preserved below. Rule 12–216, which defines the scope of appellate review, states: "To preserve a question for review it must appear that a ruling or decision by the district court was fairly invoked." With respect to jury instructions, a ruling or decision by the district court may be fairly invoked by either a formal objection to the instruction that is to be given to the jury by the court, or by tendering a correct instruction. *See, e.g., State v. Compton*, 57 N.M. 227, 236, 257 P.2d 915, 921 (1953) ("[W]here the court has not instructed on the subject it is sufficient to preserve the error if a correct instruction is tendered."). "The primary purpose of any objection to an instruction is, of course, to alert the mind of the judge to the claimed error contained in it, to the end that he may correct it." *Id.* Hence, "[t]imely objections to improper instructions must be made or error, if any, will be regarded as waived in every case." *State v. Garcia*, 46 N.M. 302, 307, 128 P.2d 459, 462 (1942).

{27} Although New Mexico courts generally adhere to the preservation requirement, Rule 12–216(B) provides exceptions that allow appellate review despite a party's failure to preserve error. Rule 12–216(B)(2) provides: "This rule shall not preclude the appellate court from considering ... questions involving: ... fundamental error or fundamental rights of a party." This doctrine of fundamental error is founded on every court's "inherent power to see that a man's fundamental rights are protected in every case." *State v. Garcia*, 19 N.M. 414, 421, 143 P. 1012, 1014 (1914).

> Where a man's fundamental rights have been violated, while he may be precluded by the terms of a statute or the rules of appellate procedure from insisting in this court upon relief from the same, this court has the power, in its discretion, to relieve him and to see that injustice is not done. The restrictions of the statute apply to the parties, not to this court.

*Id.* at 421, 143 P. at 1015. The Court, however, "will exercise this discretion very guardedly, and only where some fundamental right has been invaded, and never in aid of strictly legal, technical, or unsubstantial claims." *Id.* Accordingly, fundamental error will only apply in exceptional circumstances. *Cunningham*, 2000–NMSC–009, ¶ 13, 128 N.M. 711, 998 P.2d 176. Thus, the doctrine of fundamental error is more than a mere exception to the preservation requirement. It also provides the standard under which the issues claimed by the Defendant for the first time on appeal are reviewed. Therefore, review for fundamental error contains both procedural and substantive significance.

### B.

{28} The fundamental flaw in the majority's analysis in this case is that it depicts fundamental error as merely an exception to the preservation requirement and utterly ignores the doctrine's substantive force. The majority, concluding that the Defendant did not properly preserve the claimed errors below, holds that "the omission of unlawfulness from instruction 12 constituted fundamental error." Majority Opinion at ¶ 11. Moreover, the majority finds that "because of its distance from the erroneous elements instruction and the unlikelihood that the jury would, sua sponte, graft language from a proper instruction onto improper instructions, the single proper instruction did not correct the improper self-defense instruction." Majority Opinion at ¶ 1. Hence, the majority reverses the Defendant's conviction for second degree murder by extricating the jury instructions from the context of the individual facts and circumstances of the case and reviews the instructions for facial errors. Such a technical and formalistic approach does not constitute review for fundamental error. *See Cunningham*, 2000–NMSC–009, ¶ 12, 128 N.M. 711, 998 P.2d 176 (recognizing that the doctrine of fundamental error is never used to aid "strictly legal, technical, or unsubstantial claims"). Instead, by limiting its analysis to an isolated review of the jury instructions, the majority in effect reviews this case for reversible error rather than for fundamental error.

{29} Fundamental error and reversible error are two distinct standards of review that have significantly different focuses and arise in different procedural circumstances. First, the procedural distinction between these two standards is apparent since review for reversible error arises when a Defendant preserves error below. This procedural distinction is significant because it shapes the Court's review on appeal and defines the scope of the Court's substantive analysis. For instance, where the defendant properly preserves an issue in the trial court, the appellate court is aware of where to focus its review on appeal. In contrast, where there is no specific preservation of error—in fact, where the defendant has waived all error—the court's focus on appeal is less articulate. As a result, the scope of the substantive review, when error is not preserved, is somewhat broader. I will illustrate these concepts below.

### 1.

{30} First, an example of review for reversible error is provided in *State v. Parish*, 118 N.M. 39, 878 P.2d 988 (1994). In *Parish*, the defendant, who was convicted of voluntary manslaughter, appealed his conviction on the basis of errors in the jury instructions. *Id.* at 41, 878 P.2d at 990. The defendant claimed that the trial court failed to "instruct the jury that they must decide whether the killing was unlawful when a claim of self-defense is raised" and that "the instructions failed to explicitly place the burden upon the State to prove that Defendant did not act in self-defense." *Id.* The Court reviewed the claimed errors under a reversible error standard of review since the defendant objected at trial to the jury instructions and offered other instructions that were refused. *See id.* at 42, 878 P.2d at 991; *see also Cunningham*, 2000–NMSC–009, ¶ 16, 128 N.M. 711, 998 P.2d 176 (recognizing that "*Parish* properly analyzed the jury instructions under a reversible error standard because the defendant in *Parish* not only objected to the proffered instructions, he also offered his own correct instructions"). Since the defendant alerted the court's attention to the errors in the jury instructions by objecting at trial, this Court focused its entire analysis on the claimed errors in the jury instructions.

{31} Therefore, under a reversible error standard, it is clear that the appellate court's substantive analysis is focused on the error preserved in the trial court—namely, the claimed error in the jury instructions. In determining whether the error claimed rises to the level of reversible error, the appellate court "will accept the slightest evidence of prejudice, and all doubt will be resolved in favor of the party claiming prejudice." *State v. Traxler*, 91 N.M. 266, 268, 572 P.2d 1274, 1276 (Ct.App.1977). To determine whether there is any evidence of prejudice, the appellate court will look to the jury instructions as a whole and assess whether "a reasonable juror would have been confused or misdirected" by the instructions. *Parish*, 118 N.M. at 42, 878 P.2d at 991. Accordingly, the focus in a reversible error analysis is placed entirely on the jury instructions.

### 2.

{32} The analysis under a fundamental error standard, however, is decidedly different than the analysis under a reversible error standard. *See Cunningham*, 2000–NMSC–009, ¶ 21, 128 N.M. 711, 998 P.2d 176.

> The main analytical distinction between a fundamental error analysis and a reversible error analysis is the level of scrutiny afforded to claims of error. Parties alleging fundamental error must demonstrate the existence of circumstances that "shock the conscience" or implicate a fundamental unfairness within the system that would undermine judicial integrity if left unchecked. Parties who have properly preserved an alleged error for appeal are afforded a much less onerous level of scrutiny under a reversible error standard as provided in *Parish*.

*Id.* (citations omitted). To claim that the analysis under fundamental error and reversible error is the same except that the Court invokes a fundamental error review when the error is not preserved "would eliminate the preservation of error requirement of our appellate jurisprudence" and "compromise the intent embodied in Rule 12–216." *Id.* at ¶ 18. Therefore, review under fundamental error is substantively different.

{33} In a fundamental error analysis, where the defendant has waived all error by failing to object, the Court's goal is to search for injustice. *See State v. Orosco*, 113 N.M. 780, 784, 833 P.2d 1146, 1150 (1992). "The rule of fundamental error applies only if there has been a miscarriage of justice, if the question of guilt is so doubtful that it would shock the conscience to permit the conviction to stand, or if substantial justice has not been done." *Id.* Thus, the doctrine provides this Court with the flexibility to review even unpreserved error to ensure that the interests of justice are served. The Court's focus in such a review, therefore, is not whether there is error in the jury instructions per se, but whether the defendant was wrongly convicted or suffered such an injustice that this court should not allow the conviction to stand. "To establish fundamental error, there must be a showing that error was of such magnitude that it affected the trial outcome." *State v. Jacobs*, 2000–NMSC–026, ¶ 58, 129 N.M. 448, 10 P.3d 127. Accordingly, we need to consider the individual facts and circumstances of the case to fulfill our role as the final arbiter of justice in the criminal justice system. This is not a limited inquiry as the majority's analysis suggests, but an exceedingly broad inquiry.

### II.

{34} In the following section I analyze the present case pursuant to what I understand to be a true fundamental error analysis.

### A.

{35} The primary question with respect to any case on appeal is whether the issues and errors presented were properly preserved. Upon review of the record, I find that the Defendant failed to properly preserve any of the claimed errors on which he seeks appellate review. First, at no time during trial did the Defendant object to the omission of unlawfulness from any of the essential elements instructions or alert the court's attention to the ambiguous statement regarding the State's burden of proof in Instruction 15. In fact, not only did the Defendant fail to object to these now claimed errors, but he also tendered essential elements instructions which omitted the element of unlawfulness as well as proposed several self-defense instructions which included the ambiguous burden

of proof statement of which the Defendant now complains. "Ordinarily a defendant may not base a claim of error on instructions he or she requested or to which he or she made no objection." *State v. Varela*, 1999–NMSC–045, ¶ 11, 128 N.M. 454, 993 P.2d 1280. "The defendant having failed to comply with the [preservation] Rule is not now in a position to complain that the court erred in the instruction[s] given." *State v. Sena*, 54 N.M. 213, 217, 219 P.2d 287, 289 (1950). Therefore, these errors were not properly preserved.

{36} Further, I also do not find that the Defendant's claimed error regarding the trial court's omission of UJI 14–5171 NMRA 2001 from the final jury instructions was properly preserved. Of course, I acknowledge that the Defendant tendered an instruction based on UJI 14–5171, which read:

Evidence has been presented that the Defendant *killed* Marco LaPlante while defending himself.

The *killing* is in self-defense if:

1. There was an appearance of immediate danger of death or great bodily harm to the defendant as a result of the victim coming his direction with a deadly weapon;

2. The Defendant was in fact put in fear by the apparent danger of immediate death or great bodily harm and *killed* Marco LaPlante because of that fear; and

3. A reasonable person in the same circumstances as the Defendant would have acted as the Defendant did.

In considering this defense, and after considering all the evidence in the case, if you have a reasonable doubt as to Defendant's guilt, you must find him not guilty.

(Emphasis added.). The district court agreed to instruct the jury on justifiable homicide pursuant to the Defendant's tendered instruction and to place the instruction after the first and second degree murder instructions. For this reason, the Defendant argues that this Court should review this error pursuant to a reversible error standard of review. *See, e.g., Cunningham*, 2000–NMSC–009, ¶ 21, 128 N.M. 711, 998 P.2d 176 ("Parties who have properly preserved an alleged error for appeal are afforded a much less onerous level of scrutiny under a reversible error standard as provided in *Parish*."). Here, however, it is not that the district

court failed to instruct on the subject of self-defense; rather the court, through inadvertence, gave the jury two self-defense instructions pursuant to UJI 14–5183 NMRA 2001. Thereby, the court mistakenly omitted UJI 14–5171.

{37} The court's mistake was apparent when the judge verbally instructed the jury at the close of the evidence. The judge read to the jury Instruction 15 as it appeared in the final jury instruction packet.

Evidence has been presented that the Defendant acted while defending himself.

The Defendant acted in self-defense if:

1. There was an appearance of immediate danger of death or great bodily harm to the Defendant as a result of being attacked with a deadly weapon by Marco LaPlante; and

2. The Defendant was in fact put in fear, by the apparent danger of immediate death or great bodily harm and *struck* Marco LaPlante because of that fear; and

3. The apparent danger would have caused a reasonable person in the same circumstances to act as the Defendant did.

In considering this defense, and after considering all the evidence in the case, if you have a reasonable doubt as to the Defendant's guilt, you must find him not guilty.

(Emphasis added.). Despite the court's obvious oversight, the Defendant failed to alert the judge of this mistake:

[W]here the court has instructed erroneously on the subject, although a correct instruction has been tendered on the point, if it leaves it doubtful whether the trial judge's mind was actually alerted thereby to the defect sought to be corrected by the requested instruction, the error is not preserved unless, in addition, the specific vice in the instruction given is pointed out to the trial court by proper objection.

*State v. Henderson*, 81 N.M. 270, 271, 466 P.2d 116, 117 (Ct.App.1970). Therefore, although the Defendant tendered UJI 14–5171, which the trial court accepted, he cannot "properly remain silent knowing that the court, in covering ... its instructions, has overlooked or inadvertently omitted an es-

sential element." *Id.* Under these circumstances, the court was not alerted to its inadvertence and therefore the claimed error was not properly preserved. Accordingly, because the Defendant failed to preserve the errors now claimed he "will be regarded as having waived the objection, and cannot [now] complain of the court's failure or refusal to give a proper instruction, or of an improper or inaccurate instruction which it has given." *Garcia,* 46 N.M. at 308, 128 P.2d at 462.

**B.**

{38} As discussed above, even if the Defendant fails to preserve, the Court may exercise its discretion to review for fundamental error. The initial question this Court must ask itself in a fundamental error analysis is whether the Defendant was wrongly convicted or suffered such injustice that this Court should not allow the conviction to stand. To determine whether the Defendant's conviction shocks the judicial conscience, the focus must preliminarily be directed at the conviction and the elements of the crime upon which the jury found the defendant guilty. "If there is substantial evidence ... to support the verdict of the jury, we will not resort to fundamental error." *State v. Rodriguez,* 81 N.M. 503, 505, 469 P.2d 148, 150 (1970); *see State v. Sisneros,* 79 N.M. 600, 606, 446 P.2d 875, 881 (1968) (holding that because there was ample evidence to support the conviction, whatever errors may have been committed failed to constitute a basis for finding fundamental error). Because I find substantial evidence in the record to show that the Defendant killed the victim without legal justification, and since the Defendant failed to demonstrate any circumstances that would "shock the conscience" or show a fundamental unfairness, I would hold that fundamental error did not occur in this case.

**1.**

{39} Here, the Defendant was convicted of second degree murder. Second degree murder is defined in NMSA 1978, § 30-2-1(B) (1994):

Unless he is acting upon sufficient provocation, upon a sudden quarrel or in the heat of passion, a person who kills another human being without lawful justification or excuse commits murder in the second degree if in performing the acts which cause the death he knows that such acts create a strong probability of death or great bodily harm to that individual or another.

Accordingly, in the present case, the jury was given Instruction 12 that advised:

For you to find the defendant guilty of second degree murder, the state must prove to your satisfaction beyond a reasonable doubt each of the following elements of the crime.

The defendant killed Marco La Plante;

The defendant knew that his acts created a strong probability of death or great bodily harm to Marco La Plant;

The defendant did not act as a result of sufficient provocation;

This happened in New Mexico on or about 7th day of July, 1997.

*See* UJI 14-210 NMRA 2001. The Defendant's primary contention is that this instruction was erroneous because, as indicated in Section 30-2-1(B), unlawfulness is an essential element of second degree murder, yet it was omitted from Instruction 12.

{40} Of course, as defined in Section 30-2-1(B), unlawfulness is an element of second degree murder. However, "it is presumed that any killing of another is unlawful unless that killing is justified or excused." *Cunningham,* 2000-NMSC-009, ¶ 9, 128 N.M. 711, 998 P.2d 176; *State v. Noble,* 90 N.M. 360, 364, 563 P.2d 1153, 1157 (1977). It is the Defendant's burden to rebut this presumption of unlawfulness by producing some evidence, even slight evidence, to support the claim that the killing is justified. *State v. Duarte,* 1996-NMSC-038, ¶ 8, 121 N.M. 553, 915 P.2d 309.

{41} "It is well-settled that '[s]elf-defense [or defense of another] is a justification to all homicides and results in acquittal rather than mitigation.' " *State v. Gallegos,* 2001-NMCA-021, ¶ 9, 130 N.M. 221, 22 P.3d 689 (quoting *State v. Abeyta,* 120 N.M. 233, 239, 901 P.2d 164, 170 (1995), *abrogated on other grounds by State v. Campos,* 1996-NMSC-043, ¶ 32 n. 4, 122 N.M. 148, 921 P.2d 1266). To support an instruction on self-defense, the

Defendant must have presented some evidence that: " '[ (1) ] the defendant was put in fear by an apparent danger of immediate death or great bodily harm[;] [ (2) ] that the killing resulted from that fear[;] and [ (3) ] that the defendant acted as a reasonable person would act under those circumstances.' " *State v. Lopez*, 2000–NMSC–003, ¶ 23, 128 N.M. 410, 993 P.2d 727 (quoting *State v. Branchal*, 101 N.M. 498, 500, 684 P.2d 1163, 1165 (Ct.App.1984)). Therefore, an instruction on self-defense should be given if the Defendant produces evidence " 'sufficient to allow reasonable minds to differ as to *all* elements of the defense.' " *Id.* (emphasis added). Once the Defendant presents such evidence as to each element of self-defense, it is the court's duty " 'to instruct the jury fully and clearly on all phases of the law on [that] issue.' " *Id.* (quoting *State v. Heisler*, 58 N.M. 446, 455, 272 P.2d 660, 666 (1954)).

{42} In the present case, the Defendant failed to introduce sufficient evidence to allow reasonable minds to differ as to all the elements of self-defense. During trial the Defendant testified that he was placed in fear when the victim approached him with what appeared to be a gun. As a result of this fear, the Defendant struck the victim in the head or shoulder with a whiskey bottle, at which point the victim dropped the weapon and he and the Defendant fell to the ground and began fighting. While on the ground, the victim was on top of the Defendant and six to seven other individuals began kicking the victim in the head and back. Defendant stated that when he got up from the ground he stood above the victim, and along with five to seven other individuals, continued to kick him. On direct examination, the Defendant testified:

Q: Then what happened?

A: Then they pull him off me a few feet and that's when I get up.

Q: What were you feeling at that point? How were you feeling?

A: I was mad.

Q: Why were you mad?

A: I was just mad ...

Q: So, Lathan, at that point were you able to get up?

A: Excuse me?

Q: Were you able to get up?

A: Um, yeah.

Q: Do you recall anyone helping you?

A: No, I don't.

Q: Ok. Now did you see what had happened to Marco LaPlante before you got up?

A: No.

Q: So, so what did you do then Lathan?

A: I kicked him.

Q: Ok, describe that ... describe how you got up ...

A: I got up using my hands and getting up and running, kicking him.

Q: Do you know where you kicked him?

A: No, I can't really say where I kicked him.

Q: Why?

A: I know I kicked him.

Q: Why can't you say where you kicked him, you can't remember or what ...

A: I know I kicked him, but I can't, I don't know the actual, the actual points where I was planning to kick. I just was kicking him.

Q: Ok, was it because you were just real mad.

A: Yes.

Q: Ok, did you, could you have kicked him in the head?

A: I could have.

According to the Defendant, therefore, after the victim was no longer a threat, after the victim was on the ground being kicked by five to seven other individuals, the Defendant stood up and, as stated in the Defendant's Brief in Chief, "*angrily* started kicking LaPlant." (Emphasis added.).

{43} Even under the defense's theory of the case, the Defendant was not entitled to a self-defense instruction. The Defendant failed to present any evidence to show that the killing of the victim resulted from the Defendant's initial fear or that the Defendant acted as a reasonable person would act under the same circumstances. Instead, the Defendant's right to use force ended when the danger ceased and the victim was disabled and on the ground being repeatedly kicked by the Defendant. *See, e.g., State v. Garcia*, 83 N.M. 51, 54, 487 P.2d 1356, 1359 (Ct.App.

1971). Therefore, there was insufficient evidence to allow reasonable minds to differ on the second and third elements of self-defense. As such, although the Defendant may have been entitled to a self-defense instruction as a justification to the initial aggravated battery—when the Defendant struck the victim with the whiskey bottle—the Defendant failed to introduce any evidence that showed that the killing of the victim resulted from the Defendant's exercise of self-defense. Therefore, the evidence at trial was not sufficient to require submission of instructions to the jury on self-defense as to any of the homicide charges.

{44} Moreover, the extent of the victim's injuries is not indicative of the Defendant fearing for his life and acting out of self-defense. Patricia McFeely, a forensic pathologist for the Office of the Medical Investigator for the State of New Mexico, performed an autopsy on the victim's body. Dr. McFeely testified that the victim died four days after the incident from a combination of fatal head injuries. There was subdural bleeding on the left side of the brain and areas of bruising or contusions on the brain on both the right and left side. As a result, there was a lot of swelling to the victim's brain. The doctor testified that the areas of bruising on the brain were indicators of a substantial amount of force.

{45} In addition to the significant injuries to his brain, the victim also sustained smaller, less significant injuries on his arms, around his head, right eye, and right eyelid, extending down the right side of his face. Also, there were abrasions over his collarbone, right back and shoulder, on his left upper arm, back of his left lower arm, and on his knuckle. Internally, inside his stomach, there were areas of about four by three inches of soft tissue hemorrhage, which would indicate substantial blows to the abdomen. The injuries sustained by the victim were "extremely brutal and unnecessary blows by the defendant not consistent with self-defense." *State v. Martinez*, 95 N.M. 421, 423, 622 P.2d 1041, 1043 (1981); *see, e.g., Lopez*, 2000–NMSC–003, ¶¶ 25–26, 128 N.M. 410, 993 P.2d 727 (holding that although the victim was the initial aggressor, the defendant was not entitled to a self-defense instruction when the evidence showed that the defendant inflicted fifty-four stab wounds upon the victim and crushed his head with a rock).

{46} Consequently, "the facts in evidence did not warrant submitting the issue of self-defense." *State v. Heisler*, 58 N.M. 446, 452, 272 P.2d 660, 664 (1954). "Hence, in so far as the jury was instructed at all on that subject, the defendant got more than he was entitled to on the evidence and error, if any, in the instructions so given may not be made the basis of a reversal." *Id.; see also State v. Livernois*, 1997–NMSC–019, ¶ 15, 123 N.M. 128, 934 P.2d 1057 (holding that where there is sufficient evidence for the jury to conclude that the defendant killed the victim with the requisite intent, any deficiency in the jury instructions is inconsequential).

### III.

{47} Despite the broad nature of fundamental error review, the majority reverses the Defendant's conviction for second degree murder by taking the jury instructions out of context and analyzing the claimed error in isolation. The notion that in a fundamental error analysis we should look solely to the jury instructions ignores the entire foundation upon which the doctrine of fundamental error is built and confuses a reversible error standard for a fundamental error standard. It is simply inconsistent to assert that under this broad doctrine, where we go in search of injustice, that we should be limited to looking only at the jury instructions. In deciding this case, as well as others like it, it is necessary to look far beyond the jury instructions at issue; we need to consider the individual facts and circumstances of the case and contemplate our role as the final arbiter in the criminal justice system. This is not a limited inquiry. To assert otherwise, as the majority opinion does, ignores the basic precepts of the doctrine of fundamental error. Upon my review of the individual facts and circumstances of this case, I find substantial evidence in the record to show that the Defendant killed the victim without any legal justification. Since the Defendant failed to demonstrate any circumstances that would shock the conscience or show a fundamental

unfairness, I find no fundamental error. For these reasons, I respectfully dissent.

SERNA, Chief Justice (dissenting).

{48} I respectfully dissent. I concur in Justice Baca's dissent and agree with his thorough review of the doctrine of fundamental error. I write separately to express one additional reason why I believe the instructional error in this case does not amount to fundamental error. I believe that the element of unlawfulness was necessarily established under the instructions given by the trial court. "Clearly, when a jury's finding that a defendant committed the alleged act, under the evidence in the case, necessarily includes or amounts to a finding on an element omitted from the jury's instructions, any doubt as to the reliability of the conviction is eliminated and the error cannot be said to be fundamental." *Orosco*, 113 N.M. at 784, 833 P.2d at 1150.

{49} "It is the element of unlawfulness that is negated by self-defense." *Parish*, 118 N.M. at 43, 878 P.2d at 992. To include the element of unlawfulness, the trial court should have instructed the jury that the State had to prove beyond a reasonable doubt that Defendant did not act in self-defense. This instruction could have been contained in the essential elements instruction or in the instruction defining self-defense. *See State v. Sosa*, 1997–NMSC–032, ¶ 31, 123 N.M. 564, 943 P.2d 1017; *State v. Armijo*, 1999–NMCA–087, ¶ 26, 127 N.M. 594, 985 P.2d 764; *see also State v. Puga*, 85 N.M. 204, 207, 510 P.2d 1075, 1078 (Ct.App. 1973) ("Instructions are to be considered as a whole; all elements of the offense need not be contained in one instruction.").

{50} The trial court did not instruct on the State's burden to disprove self-defense beyond a reasonable doubt in the instructions pertaining to second degree murder; however, the trial court did instruct the jury that, in order to prove second degree murder, the State had to prove beyond a reasonable doubt that "[t]he defendant did not act as a result of sufficient provocation." In New Mexico, as the jury was told, " '[s]ufficient provocation' can be any action, conduct or circumstances which arouse anger, rage, fear, sudden resentment, terror or other extreme emotions. The provocation must be such as would affect the ability to reason and to cause a temporary loss of self control in an ordinary person of average disposition." UJI 14–222 NMRA 2001. By contrast, self-defense has the objective component that the defendant act as a reasonable person would act under the circumstances. However, self-defense, like sufficient provocation, also contains a subjective component which requires that the defendant be put in fear of immediate death or great bodily harm. In fact, "New Mexico has long recognized that 'heat of passion' [, or sufficient provocation,] includes fear for one's own safety that may result in an unreasonable belief in the need to defend oneself." *State v. Abeyta*, 120 N.M. 233, 240, 901 P.2d 164, 171 (1995). "If the jury rejects the theory of self-defense, it may still find that the defendant acted under provocation of fear and may mitigate the charge of murder to the lesser charge of voluntary manslaughter." *Id.* "[T]he critical difference between self-defense and voluntary manslaughter lies not in provocation or the emotion of fear, but rather in the reasonableness of the defendant's conduct in killing." *Id.* (quoted authority and quotation marks omitted). "It is not unreasonable that the accused should be found guilty of voluntary manslaughter where the plea of self-defense fails." *Id.*

{51} In the present case, based on the essential elements instruction for second degree murder given to the jury, the jury found beyond a reasonable doubt that Defendant did not act with sufficient provocation. As a result, the jury found beyond a reasonable doubt that Defendant did not act out of fear for his own safety. Because the jury found beyond a reasonable doubt that Defendant did not kill the victim as a result of a subjective fear, the jury necessarily found beyond a reasonable doubt that one element of self-defense, the subjective element of fear for one's life, was not present under the facts in this case. The jury's rejection of voluntary manslaughter, and verdict of guilty on the charge of second degree murder, "necessarily includes or amounts to a finding on an element omitted from the jury's instructions." *Orosco*, 113 N.M. at 784, 833 P.2d at 1150.

{52} *Parish* supports this analysis. In *Parish*, the jury convicted the defendant of voluntary manslaughter, but "the jury was first asked to decide whether Parish committed second degree murder, which is distinguished from voluntary manslaughter by the element of provocation." *Parish*, 118 N.M. at 46, 878 P.2d at 995. We were concerned in *Parish* that the instruction on provocation contained language that was similar to the instruction on self-defense. *Id.* "[T]he jury could easily have found that [the facts of the case] fell within the definition of self-defense. However, upon considering the instruction on voluntary manslaughter, the jury may also have found in these same facts the element of provocation. Both instructions describe a situation which arouses fear in the Defendant...." *Id.* As a result, "[i]t is plausible that a reasonable juror might be confused by first finding sufficient provocation to reduce the charge from second degree murder to voluntary manslaughter, and to then discard the concept of provocation and use the same facts that evinced provocation to prove self-defense." *Id.* As this discussion demonstrates, the distinction between voluntary manslaughter and self-defense, and the defendant's conviction of voluntary manslaughter, was critical to our analysis of the jury instructions in *Parish*.

{53} Unlike *Parish*, the jury in the present case rejected voluntary manslaughter based on an elements instruction that contained the appropriate burden of proof; the jury rejected the first step described in *Parish* of finding sufficient provocation. Accordingly, the jury was not faced with the question of distinguishing between provocation from self-defense. In other words, the jury rejected "imperfect" self-defense and, in so doing, also implicitly rejected "perfect" self-defense. *See Abeyta*, 120 N.M. at 240, 901 P.2d at 171 ("Although the unreasonable belief in the need for self-defense may well be termed imperfect self-defense, this label is somewhat misleading. Such conduct is not a true defense and does not justify the killing. Rather, the claim of imperfect self-defense simply presents an issue of mitigating circumstances that may reduce murder to manslaughter."). By finding beyond a reasonable doubt that the mitigating circumstance of sufficient provocation was not present, the jury necessarily also determined that the killing was "without lawful justification or excuse." NMSA 1978, § 30-2-1(B) (1994).

{54} In *Orosco*, this Court cautioned:

[U]nder the rule of fundamental error reversal is required only when the interests of justice so require. A rule of automatic reversal would mandate a new trial in every instance of a failure to instruct, even though it was not only undisputed but indisputable that the element was met. Such a result, in our view, would be a perversion of justice, a classic demonstration of profoundly inequitable results that follow when the judiciary worships form and ignores substance.

113 N.M. at 785, 833 P.2d at 1151 (quoted authority and quotation marks omitted). In this case, it is indisputable that the State demonstrated beyond a reasonable doubt that Defendant did not act in self-defense or with sufficient provocation. As a result, the majority's reversal of Defendant's second degree murder conviction elevates form above substance. For these reasons, and for the reasons expressed by Justice Baca, I respectfully dissent.